UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SARAH G. GORENA,<br><br>                 Plaintiff,<br><br>      v.<br><br>AETNA LIFE INSURANCE COMPANY,<br><br>                 Defendant. | CASE NO. C17-532 MJP<br><br>**AMENDED** ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |

The above-entitled Court, having received and reviewed:

1. Plaintiff's Motion for Summary Judgment (Dkt. No. 29), Aetna's Opposition to Plaintiff's Motion for Summary Judgment (Dkt. No. 34), and Plaintiff's Reply in Support of Plaintiff's Motion for Summary Judgment (Dkt. No. 36);

2. Aetna's Cross-Motion for Judgment on the Administrative Record (Dkt. No. 31), Plaintiff's Response to Aetna's Cross-Motion for Judgment on the Administrative Record (Dkt. No. 33), and Aetna's Reply in Support of Aetna's Cross-Motion for Judgment on the Administrative Record (Dkt. No. 35);

and the Administrative Record (Dkt. No. 32) filed in conjunction with this proceeding, rules as follows:

IT IS ORDERED that Defendant's Cross-Motion for Judgment on the Administrative Record is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment is GRANTED. Defendant is ordered to approve and pay Plaintiff's long-term disability claim to the present.

IT IS FURTHER ORDERED, pursuant to 29 U.S.C. § 1132(a)(1)(B), that, subject to the terms and conditions of the Plan, Defendant continue to pay Plaintiff's long-term disability claim to the policy's maximum benefit absent a showing of improvement in her medical record such that a reasonable physician would conclude that she could work in any reasonable sedentary occupation in the competitive workforce (as defined by the Plan) for which she has the education, training and experience, and is capable of performing productively, full-time, without undue disruptions and absences due to her MS and its related symptoms.

**Background**

Plaintiff's Condition and Medical/Psychological History

Plaintiff worked for Boeing as a Staff Analyst from February 2005 through July 20, 2015. (Stip. Admin. Record ["AR"] at 7916.) She was diagnosed with multiple sclerosis ("MS") in 2007. (AR 8409.) Her disability request is based solely on her MS, but over the years she has had co-diagnoses of chronic lumbar back pain, joint pain, polycystic ovary syndrome accompanied by morbid obesity, gastrointestinal difficulties following bariatric (weight loss, migraine) surgery (AR 109-12, 3419, 8409-11, 8423-26), depression (AR 7904), and substance abuse (from which she has been in recovery since mid-2014; AR 8462, 8578, 6666).

From 2013 to 2015, six short-term medical leaves (Short Term Disability or "STD") for MS symptoms were approved. (AR 8524.) Additionally, Plaintiff has had two ER visits and received numerous steroid injections to treat her condition. (AR 8504, 6911, 3026, 4898, 8510, 6667, 6929, 399.)

Plaintiff's treating physician is Dr. Reif, who has maintained a clinical practice since 1982, conducted MS research (including clinical drug trials), taught other medical professionals, and performed disability/employability determinations for years. (AR 8407.) Dr. Reif has been treating Plaintiff since October 2007; i.e., over 8 years by the time Plaintiff applied for long-term disability ("LTD"). (AR 1635, 8409.)

Plaintiff's treating physician has chronicled a decline in Plaintiff's condition since 2015. A January 2015 MRI detailed a further progression of the disease from a 2012 baseline, including new lesions in the spinal cord. (AR 8423-24, 8462.) Another flare in February 2015 prompted Dr. Reif to note the "increasing frequency of relapses" and to speculate that Plaintiff might be a candidate for a stem cell transplant. (AR 8462-63.) Plaintiff had not worked since January 2015 (AR 8462) and Dr. Reif authorized medical leave through February 23, 2015. (AR 7430-32.)

By mid-2015, Plaintiff was also experiencing increasing bowel problems: her GI specialist (Dr. Ramakrishnan) diagnosed the symptoms as "MS-related constipation" so severe that he authorized a medical leave for Plaintiff from April 8 through May 20, 2015. (AR 7390-95, 7406.) She was also diagnosed in May 2015 with 'Major Depressive Disorder due to medical condition." (AR 7904.)

Plaintiff's medical records were reviewed by Aetna physicians in relation to an STD request in May-June of 2015. A neurologist (Dr. Cohan) analyzing Plaintiff's records adjudged

that she was not functionally impaired neurologically from April 8 to July 14, 2015. (AR 7376.) Dr. Cohan conferred with Dr. Reif on July 27, 2015 and reported that Dr. Reif disclosed no functional impairments during the period in question. (Id.)[1] A gastroenterologist (Dr. Molina) noted that, while bowel accidents and incontinence were a "nuisance," they did not represent functional incapacity and that no examinations or clinical findings documented a loss of function during the April – July 2015 period. (AR 7370.) STD benefits were ultimately approved through June 1, 2015, on the basis of behavioral health issues and withdrawal from anti-depressant medication. (AR 7800.)

Plaintiff made her claim for LTD benefits on July 20, 2015. Defendant requested additional records and a clinical consultation to evaluate her request. In October 2015, Dr. Reif chronicled her worsening condition (balance problems, bladder dyscontrol, trouble finding words, depression) and opined that "it is clear that she really is not able to work at competitive employment anymore for a combination reasons." (AR 8440-41.) A new MRI revealed multiple new brain lesions, including one "consistent with a black hole" lesion. (AR 8418; this lesion either resolved or diminished later.)

In December 2015, Dr. Reif found Plaintiff "still significantly disabled with her balance and fatigue in general and also particularly with her mood," and stated that she "support[ed] her permanent disability due to the multiple medical issues." (AR 8568.) In that same month, Dr. Reif completed an Attending Physician Statement ("APS") which included her October 2015 office note and an MRI report, noting symptoms of imbalance, falling, numbness, and depression, and the presence of "multiple enhancing lesions" in the MRIs. (AR 8574-83.) Her

---

[1] The Court will ignore the hearsay issue inherent in this evidence and simply note that what Dr. Cohan *says* that Dr. Reif said is at odds with what she stated in her own reports at the time ("Overall she is having more symptoms, and not returning to normal as far as leg strength goes;" AR 8463, from Feb. 4, 2015), and is certainly contradicted by Dr. Reif's later statements.

conclusion: "Severe limitation of functional capacity; incapable of minimal (sedentary) activity." She rated Plaintiff's physical impairment as Class 5 and said that Plaintiff would never return to work. Furthermore, she predicted an increased decline in Plaintiff's condition. (AR 8576.)

Additionally, there are reports from a psychologist and psychiatrist confirming her disabled condition. Psychologist Dr. Davis (who had treated Plaintiff for nine years) identified Plaintiff as "disabled" in August 2015 on the basis of a "mood disorder due to medical condition." (AR 8604.) In January 2016, Dr. Davis again declined to authorize Plaintiff's return to work. (AR 8528.) After examining Plaintiff in October 2015, psychiatrist Dr. Proano noted that her "[e]nergy and ability to sustain executive functioning are greatly exacerbated by severe M/S" (AR 8611), which he identified in January 2016 as her "primary disabling condition." (AR 8530; emphasis in original.)

History of LTD Claim

Upon receipt of Dr. Reif's December 23, 2015 APS form, an Aetna nurse (Mr. Thornton) logged a "Clinical Review" which attributed Plaintiff's limitations "solely to depression symptoms" and suggested a behavioral health evaluation (AR 7948-49), which resulted in the January 16, 2016 report by Dr. Davis diagnosing Plaintiff with "[d]epression due to medical condition." (AR 8526.) Plaintiff was then interviewed by one of Aetna's "Behavioral Health Specialists" (AR 7958-60). Nurse Thornton added additional notes indicating that his prior determination was unchanged (AR 7971) and on January 24, 2016, Defendant denied Plaintiff's LTD claim, finding that Plaintiff's "intact strength, coordination, and no spasticity with only mild sensory issues to feet" left her able to perform sedentary work. (AR 8113-15.)

Plaintiff appealed the denial, submitting Dr. Reif's resume, chart notes, two letters from Dr. Reif, a list of her MS-related medical leaves since 2013, and a Physical Residual Functional Capacity Assessment ("FCE"). (AR 8396-8537.) Dr. Reif's February 4, 2016 letter chronicled the "cumulative effect" of living with MS for 18 years and listed clinical findings (chronic imbalance, sensory loss, depression, diminished executive function, bowel/bladder accidents and accidental falls) in support of her conclusion that it was "impossible for her to maintain employment." (AR 8409-10.) She pointed out that the October 2015 MRI showed "at least 50 old lesions, three new active enhancing lesions and new 'black hole'… indicating that she has reached the point of complete cell death in that region." (Id.) Dr. Reif pointed out that the lesions were located in the areas of the brain associated with personality, mood, and memory. (Id.)

Aetna's response was to characterize Dr. Reif's letter as "advocating for EE(*employee*)'s disability" (AR 8002) and to conclude that "[t]here are no additional exam or diagnostic findings… to alter the prior determination." (AR 8005.)

Dr. Reif responded by authoring a second letter in March 2016, summarizing the symptoms and findings that pointed to the "increasing cumulative effect of this illness on her" and the "pattern of increasingly severe relapses." (AR 8413-14.) She also described symptoms identified by a neuro-ophthalmologist which included bilateral optic nerve damage and loss of color vision. (AR 8415.) She indicated by means of an FCE all the physical limitations which would preclude Plaintiff from returning to even sedentary work, including an inability to sit for more than 6 hours, fatigue, cognitive dysfunction, limits on her ability to stand, walk, lift or carry, and limited left eye function. (AR 8416, 8418.)

Aetna referred Plaintiff's appeal to a neurologist (Dr. Graham) whose review revealed "neurological examinations with no progressive decline in examination status," "intact vision, cognition, and speech, as well as intact motor strength" with only minor sensory loss, and normal walking ability (while observing that "morbid obesity… [is] noted to affect walking and balance difficulty." (AR 8333.) The appeal was denied.

A final July 12, 2016 letter from Dr. Reif summarized a June 2016 exam and new MRIs. She reported "more difficulties with balance and fatigue and "ongoing disease progression" revealed by the brain MRI. She recommended a 3-day IV steroid treatment, a second opinion consult on more aggressive MS drugs and that Plaintiff not return to work "on the basis of her disease both from the physical standpoint (weakness and fatigue), as well as her cognitive issues." (AR 8347-51.)

Aetna's response was to conclude that the new clinical records did not "provide clinical correlation for any specific restrictions" precluding sedentary work. After reiterating Dr. Graham's conclusions regarding Plaintiff's "intact vision, cognition and speech, as well as intact motor strength," the company again denied her appeal. (AR 8129, 8333.) This lawsuit followed.

**Discussion/Analysis**

Standard of review

Because the Plan is insured by Defendant in the State of Washington, *de novo* review is required. WAC 284-50-321. *See* Landree v. Prudential Ins. Co. of Amer., 833 F.Supp.2d 1266, 1274 (W.D. Wash. 2011). Neither party contests that this is the appropriate standard of review.

Disability test under the Plan

There is a two-part test of disability under the Plan:

(1) an initial "own occupation" test:

From the date that you first become disabled and until monthly benefits are payable for 24 months, you will be deemed to meet the test of disability on any day that:
- You cannot perform the **material duties**[2] of your **own occupation**[3] solely because of an **illness, injury** or disabling-pregnancy-related condition; and
- Your work earnings are 80% or less of your **adjusted predisability earnings.**

(AR 8732; emphasis in original.)

(2) a final, "any reasonable occupation" test: after the first 24 months of LTD benefits, the test changes and requires the claimant to demonstrate an inability "to work at any **reasonable occupation** solely because of an illness, injury or disabling-pregnancy-related condition." (Id.; emphasis in original.) "Reasonable occupation" is defined as "any gainful activity for which you are, or may reasonably become, fitted by education, training, or experience and which results in, or can be expected to result in, an income of more than 60% of your adjusted predisability earnings." (AR 8754.)

---

[2] "Material duties" are defined as:

Duties that:
- Are normally required for the performance of your own occupation; and
- Cannot be reasonably omitted or modified. However to be **actively at work** in excess of 40 hours per week is not a material duty.

(AR 8572; emphasis in original.)

[3] "Own occupation" is defined as:

The work that you are routinely performing when your period of disability begins. Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed:
- For your specific employer; or
- At your location or work site; and
- Without regard to your specific reporting relationship

(AR 8573.)

<u>Conflicting medical evaluations</u>

The responsibility which ERISA imposes on plan administrators sets a high standard:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
> **(A)** for the exclusive purpose of:
> **(i)** providing benefits to participants and their beneficiaries.

ERISA § 404, 29 U.S.C. § 1104.

This is the context in which the analysis performed by Aetna and the resulting denial of benefits must be evaluated. It is the considered opinion of this Court that the company's conduct falls well below the statutory standard for their fiduciary duty.

Defendant had the benefit of a series of first-hand reports from a highly-qualified physician who had been treating Plaintiff since 2007. Over the course of 18 months (January 2015 – June 2016), she provided 4 sets of MRI scans which documented the increasing severity of Plaintiff's symptoms, along with clinical findings and the patient's own reports which corroborated the steady increase of her MS and her doctor's professional evaluation of Plaintiff's inability to discharge her duties.

Aetna's response to those reports was to either ignore or misstate those portions which did not support their decision to deny, or cherry-pick statements out of context which belied Dr. Reif's conclusions and (again) supported Defendant's assessment of Plaintiff's fitness for work. The examples of this are numerous.

The initial analysis of Plaintiff's request for LTD benefits[4] contained a review of two reports from Dr. Reif, created in October and December of 2015. In the October report, Dr. Reif noted:

> INTERVAL HISTORY: … She has been noticing that her balance is off. She keeps falling down. She has such bladder dyscontrol. She has accidents before she can make it to the bathroom. She feels mentally "off." She is having trouble with word finding. She is also very depressed… When we did her last brain MRI in February 2015, there were signs of a vaguely enhancing lesion in the left temporal lobe that had not been there previously… There were also at least another 10+ lesions new that were nonenhancing between the 2013 and 2015 brain MRI suggesting progression of disease more silently…
> * * * *
> IMPRESSION: Her sensory examination certainly is changed from our last evaluation… the chronic staxia with subjective worsening is also present. How much of her communication difficulties now are just due to the effects of her depression versus multiple sclerosis is unclear. It is clear that really she is not able to work at competitive employment for a combination of health reasons.
> PLAN: … I think that she should be on some short-term disability and really this is leading to something long-term…

(AR 8440-41.)[5]

In the December report, Dr. Reif stated:

> IMPRESSION:
> 1. Multiple sclerosis: She does show some objective improvement with her base on her Romberg testing[6] and she did have a clear exacerbation. She is still significantly disabled with her balance and fatigue in general and also particularly with her mood.
> 2. Depression. This remains very problematic.
> PLAN: I support her permanent disability due to multiple medical issues.

(AR 8568.)

---

[4] Performed, not by a doctor, but by a nurse whose qualifications to evaluate Plaintiff's condition and prognosis were not placed in evidence.

[5] There was also an October 2015 MRI scan which reported "[a] new enhancing lesion… consistent with a black hole lesion."

[6] An eyes-closed balance test.

Nurse Thornton's review of Dr. Reif's findings:

The APSs and BHCS primarily report mental nervous symptoms….

The clinical exam finds intact strength, coordination and no spasticity with only very mild sensory issues to feet… that does not affect ee's (*employee's*) ability to ambulate unaided.

Any L/R's (*limitations/restrictions*) to sedentary work function should be attributed solely to depression symptoms that should have BHU (*Behavioral Health*) evaluation.

(AR 7948-49.) The nurse's opinion that Dr. Reif "*primarily* report[ed] mental nervous symptoms" and that Plaintiff's limitations "should be attributed *solely* to depression symptoms" (emphasis supplied) almost lead the Court to believe that he did not read Dr. Reif's documentation and conclusions regarding Plaintiff's condition closely.

Plaintiff submitted a series of MRI scans which revealed the progression of her MS over time. An October 2012 MRI showed "2 or 3 new lesions that were not fresh or acute and one lesion that was enhancing… and suggested it was active." (AR 4898; Dr. Reif's December 2012 report.) An April 2013 MRI of Plaintiff's brain (taken when she was hospitalized for exacerbated MS symptoms) demonstrated "numerous enhancing lesions." (AR 8475.) An October 2015 scan revealed an area commensurate with a "black hole" lesion. (AR 8410.) A June 2016 MRI prompted a letter from Dr. Reif, concerned that the scan "has displayed again ongoing disease progression." It is apparent to the Court that Defendant's medical analysts simply ignored this information, as well as Dr. Reif's characterization of Plaintiff's "downhill course over the last four years," as demonstrated by a "pattern of increasingly severe relapses." (AR 8414-15.)

Aetna did not have a doctor review Plaintiff's application until she appealed the denial of her LTD request. Dr. Graham reviewed years of Dr. Reif's medical records and letter, 10 MRIs,

14 psychological reports and 16 APS forms and concluded that Plaintiff was capable of doing full-time sedentary work. (AR 8329-35.) He justified this conclusion by cherry-picking every phrase or sentence from the materials which was indicative of some aspect of Plaintiff's condition that was "stable" or "normal." In the face of Plaintiff's reports of trouble word-finding, falling down and incontinence, and Dr. Reif's findings indicating poor balance, weakness in various muscles, sensory loss, and problems with executive function and memory (AR 8410, 8414, 8462-63, 8532-33), he noted "intact vision, cognition, and speech, as well as intact motor strength, with some patch sensory loss in the distal legs and feet." He attributed her difficulties walking and balancing to her excessive weight (AR 8333), characteristic of an overall pattern on the part of Aetna's analysts of assigning Plaintiff's negative symptoms to everything *except* her MS (i.e., her weight, her (former) substance abuse and her psychological/behavioral problems).

Perhaps the most egregious example of the refusal of Defendant's physicians to address any report or medical evidence which did not conform to their decision to deny LTD benefits is Dr. Reif's March 2015 FCE (Functional Capacity Evaluation) report. In that report, Dr. Reif stated unequivocally that Plaintiff was unable to stand or sit for sufficient periods of time in an 8-hour workday due to the fatigue and cognitive dysfunction resulting from her MS; that "she has poor strength and balance due to her MS;" that she is "likely to fall over if too much motion of arms is required;" and that she had visual limitations due to "optic neuritis in left eye." (AR 8515-18.) This FCE report is mentioned nowhere in any of the clinical reviews undertaken by Aetna's physicians.

Dr. Reif submitted a final letter in July 2016 which described "more difficulties with [Plaintiff's] balance and fatigue" and reported a June MRI showing further progression of the

MS. Dr. Graham submitted an addendum which noted the additional evidence but indicated (without analyzing the new data) that "the additional information submitted does no[t] change my prior assessment." (AR 8342.)

The Court is forced to conclude that, where Defendant's reviewing physicians could not selectively quote isolated statements out of context to support a denial, they either misstated those conclusions or simply ignored the evidence and conclusions presented by Plaintiff and her treating physician. Wherever possible, Defendant's medical reviewers attribute Plaintiff's functional limitations to her obesity or her depression.

Nowhere in the Administrative Record is there any indication that Plaintiff's obesity is a symptom of her MS, and it is unquestionably a contributing factor to her restrictions. But none of the physicians who actually examined Plaintiff identified her weight as the <u>primary</u> cause of her limitations. Her depression, on the other hand, while it may be due in some measure to factors not associated with her MS, can clearly not be viewed independently from her chronic illness. It is not only logical that someone suffering from a debilitating incurable condition would experience depression, but there is ample documentation tying her depression directly to her MS.[7] The insistence of Aetna's medical reviewers in identifying it as not only a completely independent condition but the primary source of her disability can only be viewed as an outcome-driven assessment made at the expense of the overwhelming weight of the evidence to the contrary.

---

[7] *See* AR 7904 – "Major Depressive Disorder due to medical condition;" AR 8526; AR 8604 – psychologist Dr. Davis's diagnosis of Plaintiff as "disabled" on the basis of a "mood disorder due to medical condition."

Additionally, the clinical reviews completely overlook Plaintiff's subjective reports of her symptoms (which lend further support to her assertions of disability due to MS), without stating any basis for questioning her credibility.

Defendant cites to case law that ERISA plan administrators are not required "automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Dis. Plan v. Nord, 538 U.S. 822, 834 (2003). It is an argument against a non-existent opposing view: Plaintiff did not invoke the "treating physician rule" anywhere in her briefing; she simply argues that the objective weight of Dr. Reif's evidence and conclusions is greater than that which should be accorded to the opinions of Defendant's clinical reviewers. And the *de novo* standard of review governing this matter certainly entitles the Court to make determinations of the relative "reliability" of the evidence presented by each side.

The Court's *de novo* finding concerning the persuasive nature of Plaintiff's evidence is driven by several considerations. One is the weight of the evidence of Plaintiff's limitations concerning standing, sitting, walking, continence, cognitive abilities, and MS-related psychological/emotional dysfunction, as outlined in the preceding pages. Another is the credibility and reliability accorded to Dr. Reif, a physician of unchallenged credentials (including a 20-year history of MS-related research and teaching; *see* CV at AR 8406) who treated Plaintiff for years leading up to the LTD application and who has consistently and credibly chronicled the factors (which she observed first-hand and through MRI scans) contributing to her conclusion that Plaintiff could not return to work.

And, finally, there is Aetna's choice to base its determination on the reports of reviews of Plaintiff's medical evidence, rather than conduct its own first-hand examination of Plaintiff. As the Ninth Circuit observed in Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 634 (9th Cir. 2009), "[w]hile the Plan does not require a physical exam by non-treating physicians, in this case that choice 'raise[s] questions about the thoroughness and accuracy of the benefits determination[.]'" (quoting Bennett v. Kemper Nat'l Services, Inc., 514 F3d 547, 554 (6th Cir. 2008).)

Based on its *de novo* review, the Court concludes that the weight of the evidence unquestionably favors Plaintiff's position and calls for a reversal of the administrator's decision to deny Plaintiff her LTD benefits. The evidence adduced by Plaintiff concerning the restrictions on her physical, cognitive and emotional abilities attributable to her MS is sufficient to establish that she was, at the time of her claim, unable to perform "the material duties of her own occupation." Defendant's refusal to credit that evidence is based on evidence and opinions which do not credibly rebut the weight of Plaintiff's data, and constitutes a breach of Aetna's fiduciary duty under ERISA to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries."

The Court is permitted, in accordance with 29 U.S.C. § 1132(a)(1)(B), to "clarify [Plaintiff's] rights to future benefits under the terms of the plan." Having been satisfied that Plaintiff has proven her inability to discharge the material duties of her sedentary position at Boeing and established beyond question the lifelong and steadily deteriorating nature of her medical condition, the Court clarifies Plaintiff's rights to future Plan benefits by finding that she is entitled to continuing LTD benefits under the "any reasonable occupation" section of the Plan.

Subject to the terms and conditions of the Plan, Defendant is directed to pay her LTD claim to the policy's maximum benefit duration absent a showing of improvement in her medical condition such that a reasonable physician would conclude that she could work in "any gainful activity for which [she is], or may reasonably become, fitted by education, training, or experience and which results in, or can be expected to result in, an income of more than 60% of [her] adjusted predisability earnings." (AR 8754.)  Unless Defendant can establish that Plaintiff is capable of performing such work productively, full-time, and without undue disruptions and/or absences due to her MS and its related symptoms, she is to continue to receive LTD benefits to the Plan's maximum duration.

The clerk is ordered to provide copies of this order to all counsel.

Dated June _15_, 2018.

*[signature]*

The Honorable Marsha J. Pechman
United States Senior District Court Judge